IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cr-36 |
| | ) | |
| YAHMIR DESHAWN KAWANTE HAMLET, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S POSITION REGARDING SENTENCING FACTORS**

Barely an adult himself at the start of this series of horrible events, 19-year-old Yahmir Hamlet changed the lives of two teenage girls – and his own – forever. He made one bad decision after another while operating in a detached environment separated by a computer screen and hundreds of miles. He also contributed to the exploitation of much younger minors by possessing child sexual abuse material.

Now years removed from that conduct, 24-year-old Yahmir has come to fully understand the consequences of his actions and he acknowledges the severity of the charges against him. He accepts responsibility for his choices and knows this Court, and the law, must hold him accountable.

Yahmir has reviewed the Presentence Report ("PSR"), including all terms of supervised release, and he has no objections. With this pleading, he states his position regarding the statutory sentencing factors.

**Procedural Summary**

A seven-count indictment was returned by an Eastern District of Virginia grand jury in Newport News, Virginia on May 13, 2025, against Yahmir. ECF No. 14. The government superseded on June 9, 2025, adding two additional charges. ECF No. 20.

On October 16, 2025, Yahmir appeared before this Court, swore an oath to tell the truth, and admitted his guilt to Counts Eight and Nine of the superseding indictment pursuant to a written plea agreement. ECF No. 28. Both counts charge him with coercion and enticement of a child in violation of 18 U.S.C. § 2422(b). ECF No. 20. A finding of guilty was withheld until sentencing, which is now scheduled for February 25, 2026. ECF No. 27.

## **Compliance While Awaiting Trial and Sentencing**

Yahmir was arrested on May 1, 2025. ECF No. 5. Following a detention hearing on May 7, 2025, the Court denied the government's motion for detention, releasing Yahmir on a personal recognizance bond that included pretrial supervision and home detention with location monitoring. ECF No. 12. For almost a year - eleven months -Yahmir has abided by all the Court's conditions of release, including abstaining from drug use. PSR ¶ 7. Frankly, were the Court to place Yahmir on supervised release for life instead of incarcerating him, Yahmir would continue to follow the Court's rules, maintaining the life of a law-abiding citizen. Understanding that he faces a mandatory minimum sentence, his compliance provides support for the sentencing request herein – 180 months of prison on each count, to run concurrently, with 15 years of supervised release to follow.

## **The Requested Term of 15 Years' Imprisonment and 15 Years of Supervised Release is the Appropriate Sentence**

The advisory guideline range is 292 to 365 months' imprisonment. *Id.* ¶ 90. While those numbers are large, expressing them in months sometimes waters down how long that sentence truly is - 24 years and 4 months at the low end to  30 years and 5 months at the high end. Essentially, the promulgators of the sentencing guidelines have determined that the crimes committed here warrant 24 to 30 years in prison.  Respectfully, the defense disagrees.

The Court well knows that the Sentencing Guidelines are advisory and are only one aspect of the sentencing analysis. *United States v. Booker*, 543 U.S. 220, 260-61 (2005). Since *Booker*, the Supreme Court has consistently and significantly broadened the range of choices in sentencing dictated by the facts of the case. *See Gall v. United States*, 552 U.S. 38, 59 (2007); *see also Kimbrough v. United States*, 552 U.S. 85 (2007); *Rita v. United States*, 551 U.S. 338, 350–51 (2007); *Cunningham v. California*, 549 U.S. 270, 286–87 (2007). As a result, "[a] district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough*, 552 U.S. at 113 (Scalia, J., concurring). A sentencing court "may not presume that the Guidelines range is reasonable," but must "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50.

Yahmir is 24 years old. His crimes are vile, but would 24 to 30 years fit these crimes? Absolutely not. Frankly, a sentence within the advisory guidelines is excessive given the specific facts here. The more appropriate sentence would be imposition of 15 years of incarceration to run concurrently, along with a longer-than-usual supervised release term. Any other sentence would be significantly greater than necessary to accomplish the purposes of sentencing stated in 18 U.S.C. § 3553(a).

### The Nature and Circumstances of the Offense

The offense conduct section of the PSR details the facts of Yahmir's coercion and enticement offenses, setting forth the Statement of Facts in its entirety to which Yahmir admitted. Essentially, in March 2023 and June 2023, Yahmir paid two minors to send him sexually explicit content of themselves via a social media application's instant messaging platform. The minors were 15 years old. In addition to this conduct, which is the bases of the counts of conviction, the

government's investigation revealed that on March 7, 2020, Yahmir uploaded a video that depicted a pre-pubescent female engaging in masturbation. PSR ¶ 9.

In December 2023, the FBI searched Yahmir's home and seized his electronic devices, and they contained image and video files of child pornography. The devices also contained evidence of instant messaging that depicted negotiations for the sale of child sexual abuse material ("CSAM"). PSR ¶ 9.

On April 29, 2025, Yahmir waived his *Miranda* rights and voluntarily spoke with a Federal Bureau of Investigation special agent. Although Yahmir denied delivering CSAM and claimed that he was only scamming people who wanted to buy it, a forensic examination of his devices showed that Yahmir had received and distributed CSAM. PSR ¶ 9. He regrets his unwillingness to admit the truth to the agents and himself, initially. *See* Exh. 1, Hamlet Allocution. Acknowledging the truth of what he did and admitting to it has allowed him to move forward.

### Yahmir's Personal History and Characteristics

Sadly, Yahmir's chaotic youth in an area of Newport News, Virginia, described as "violent, shootings, robberies, assaults" is not uncommon. His parents, Deshawn Hamlet and Enjoli Haggar, split before he was even a year old. His biological father was not around for his upbringing, and his mother's choice of partners was, at best, poor, during Yahmir's formative upbringing.



Around the age of 2 or 3, Yahmir recalls his mother becoming involved with Bradley McKiernan. Yahmir now states that the best thing that resulted from that relationship was his younger siblings- Naveah, Trinity, and J.H. In his younger

years, however, Yahmir held some resentment toward them. Between the violent assaults he witnessed by Mr. McKiernan against his mother, to the need to watch over his younger siblings while his mother worked and Mr. McKiernan partied, Yahmir felt that until he was 13 years old, he had to be another parent and the protector on the family. As he grew taller and more aware of what was happening, Yahmir began to step in when Mr. McKiernan put his hands on his mother.

About a year after that tumultuous relationship ended, Ms. Haggar became involved with Travone Hall. While they stayed together for 2 years until Mr. Hall's stealing became too much, it was the aftermath of that relationship that was worse. Mr. Hall stalked the family, harassing them and "swatting" them.

Throughout all the chaos at home, Yahmir led a different life outside of the home. Always popular in the neighborhood, he recalls have a lot of friends. In school, he played the flute and participated in football. Church and the Boys and Girls Club were an important part of his life



between the ages of 10 and 12. One stable force – his calm within the storms – has been his maternal grandmother, Kathleen Haggar. She is a nurse, a natural caretaker. Living just across the street from Yahmir and his immediate family, his grandmother had an open door for the children, and when needed allowed the family to move in when financially times became really difficult. Enjoli Haggar was the only financial support for her children and welcomed the help from her mother.

Even though Yahmir was not really interested in school growing up, he graduated from Heritage High School in June 2019. For a few months after graduation, Yahmir moved to Georgia

to try to connect with his father and his paternal siblings. He returned to Newport News, by then 19 years old, but he and his mother conflicted over his alcohol and substance use. So, he moved in with a family friend and her son. They encouraged his negative behavior, which caused its own conflicts. By 21, Yahmir decided to move out on his own.

Within a year of being on his own, he met Charridy Truslow, and they had their first child, now 4 years old. Yahmir always worked, and by then had consistent employment with Food Lion. He made sure to be present and financially support his son. The couple welcomed their second child, a daughter, a little more than a year ago. Both children are healthy, and Yahmir sincerely hopes there is a way that he can stay in their lives throughout this ordeal. Although the couple has had their struggles, and they are no longer romantically involved, Ms. Truslow remains positive and supportive of Yahmir.

Yahmir also enjoys the support of his family, close friends, and his current girlfriend. Attached are their letters of support, sharing their experiences with Yahmir and hopes for his future. *See* Exhs. 2A-2F, Letters of Support.

### Youthfulness at the Time of the Offense and at Sentencing

Yahmir's youth no doubt contributed to his poor decision making here, a fact directly relevant to the § 3553(a) sentencing factors. The Supreme Court has repeatedly recognized – in cases like *Roper*, *Graham*, and *Miller* – that inherent characteristics make young people different to sentence. As explained in *Miller*, young people "have a 'lack of maturity and an underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and heedless risk-taking." *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (*quoting Roper v. Simmons*, 543 U.S. 551, 569 (2005)). They are also "'more vulnerable... to negative influences and outside pressures,' including from their

family and peers.'" *Id*. Those Supreme Court decisions about youthful offenders "rested not only on common sense – on what 'any parent knows' – but on science and social science as well." *Id*.

Although these Eighth Amendment cases talk about youthfulness in juveniles, "the distinguishing characteristics of youth acknowledged in *Roper* and *Miller* 'do not disappear when an individual turns 18.'" *United States v. Cruz*, No. 3:94cr112, 2021 WL 1326851, at *5 (D. Conn. Apr. 9, 2021) (quoting *Roper*, 543 U.S. at 574). Indeed, research shows that "even older adolescents 'continue to demonstrate difficulties in exercising self-restraint, controlling impulses, considering future consequences, and making decisions independently from their peers'" and "under emotionally arousing conditions, 18- to 21-year-olds demonstrate[] levels of impulsive behavior comparable to those in their mid-teens." *United States v. Rosario*, No. 12cv3432, 2018 WL 3785095, at *1 (E.D.N.Y. Aug. 9, 2018) (quoting Dr. Laurence Steinberg, professor of psychology at Temple University and expert in adolescent cognitive development). For that reason, courts routinely recognize that the mitigating characteristics of youth endure at least into a person's early 20s. *See, e.g., United States v. McCoy*, 981 F.3d 271, 286 (4th Cir. 2020) (acknowledging "defendants' relative youth – from 19 to 24 years old – at the time of their offenses" was mitigating).

It is easy to see the role that Yahmir's youthfulness decision-making played here. He prioritized financial gain without giving due thought and consideration to the consequences it would have for his victims. It seems likely that with more maturity, Yahmir would have behaved much differently. Accordingly, his youthfulness at the time of the offenses and presently justify a downward variance from the advisory guideline range of imprisonment.

**<u>The Requested 15-Year Prison Term is More Than Sufficient to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment</u>**

Sentencing Yahmir to the requested 15-year prison term is the appropriate punishment for his crimes. The requested sentence also reflects the seriousness of his crime and promotes respect for the law.

These felony convictions come with significant collateral consequences. Yahmir will lose valuable rights he holds dear, including but not limited to the right to vote, serve in public office, and to possess a firearm. This for someone with no prior criminal convictions. The felony conviction is an inescapable brand that will make Yahmir's life more difficult and the weight of that should be taken into the Court's consideration. Additionally, Yahmir has shown that he does well under supervision. His compliance throughout the pretrial and presentencing process suggests that he will succeed at resuming his life as a law-abiding citizen.

Yahmir has already suffered significant collateral consequences. For starters, he lost his job due the nature of charges. PSR ¶ 79. For the same reasons, he has not been able to persuade anyone to hire him. This is outside his norm because he was worked ever since being of legal age to do so. His work ethic was corroborated by his children's mother, who told the probation officer that Yahmir "was always trying to be a provider for me and then for our children." *Id.* ¶ 68. Losing gainful employment has been jarring for a young man thrust into the role of provider as an older sibling and then found himself there again when Yahmir became a father at the tender age of 19. And as for his fatherhood, a consequence of these crimes is a condition that prohibits Yahmir from having contact with his own children unless another adult is present. *Id.* ¶ 68. In many ways, the punishment began with his arrest and will continue through his incarceration.

## The Requested 15-Year Prison Term is More Than Sufficient to
## Afford Adequate Deterrence & Protect the Public

Fifteen years is a long time to be removed from the community, especially for someone who has never been incarcerated. Anything longer than the fifteen-year prison sentence cannot be justified on specific deterrence grounds because lengthier prison sentences do not achieve better recidivism rates. As for sex offenses, individual studies and meta-analyses consistently find that "incarceration has little, if any, impact on recidivism." Kevin L. Nunes et al., *Incarceration and Recidivism among Sexual Offenders*, 31 Law & Human Behavior 305, 314 (2007). In reality, not only is the evidence supporting incarceration's deterrent effect "unimpressive;" the Nunes study found that, "[c]ounterintuitively, some [sex] offenders may actually experience incarceration as *less* aversive that some alternative sanctions." *Id*. at 306. Yahmir could benefit greatly from treatment that will explain the true harm of his offenses and incarceration does not provide the best setting for treatment. While prisoners must maintain a constant sense of alertness to survive, openness to treatment requires a willingness to be vulnerable.

Further, even after serving any imprisonment imposed by the court, Yahmir will remain under constant, extensive supervision by the probation office. He must abide by a long list of supervision conditions. He will be polygraphed and drug tested, and his online activity will be closely monitored. Thus, the requested time of incarceration, coupled with treatment and supervised release monitoring, is more than sufficient to deter Yahmir from reoffending.

The fifteen-year sentence is also more than sufficient to protect the public. Notably, Yahmir has no history of hands-on contact. Studies have found "a lack of coordination between passive child pornography viewers and active child molesters." Tess Lopez et al., *Trends and Practice Tip for Representing Child Pornography Offenders at Sentencing*, 27 Crim. Just. 29, 30 (2012) (citing *The Implications of Recidivism Research and Clinical Experience for Assessing and Treating*

*Federal Child Pornography Offenders: Public Hearing on Child Pornography Offenses Before the U.S. Sentencing Commission*, (2012) (finding that out of seventy-two individuals convicted of child pornography offenses referred to outpatient treatment, none were rearrested for a "contact" offense). In addition, probation offices have access to many tools to protect the community from child pornography offenders, "including search and seizure of offenders' residences, computers, and phones; restrictions on computer use, such as only for employment; electronic monitoring and surveillance; and compliance with treatment." *Id*. at 34.

Finally, mandatory reporting assures that the community will know of potential dangers and will allow law enforcement to monitor the offender's actions closely. *Id*. Overall, a fifteen-year prison sentence is more than sufficient to protect the public given the many preventive tools already in place.

### **Educational/Vocational Training, Medical Care, or Other Correctional Treatment**

While he is a high school graduate, Yahmir would certainly benefit from BOP programs so he can increase his skills. As he told the probation officer, a lack of financial resources prevented him from enrolling in college. Because of the statutorily required restitution, Yahmir will face tens of thousands of dollars in restitution. Gainful employment will be even more of a necessity.



Yahmir is in good physical condition and reports no history of mental health issues. However, Yahmir grew up in a crime-filled environment and watched helplessly as his mother suffered physical and verbal abuse. PSR ¶¶ 64, 65. Moreover, Yahmir's premature alcohol consumption and his abuse of Percocet and marijuana are also

troubling. The substance abuse coincides with his first involvement in the crimes that bring him before the Court, undoubtedly contributing factors. To Yahmir's credit, he recognizes that he would benefit from substance abuse treatment and related mental health treatment. *Id.* ¶ 74.

## Conclusion

For the reasons advance above, Yahmir respectfully requests the Court impose a concurrent sentence of 15 years' imprisonment, followed by a 15-year term of supervised release. This sentence would be sufficient but not greater than necessary to fulfill the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

YAHMIR DESHAWN KAWANTE HAMLET

By: _____/s/_____
         Suzanne V. Suher Katchmar
         Virginia State Bar No. 37387
         Sean Carlton Mitchell
         Virginia State Bar No. 90922
         Attorneys for Yahmir Deshawn Kawante Hamlet
         Office of the Federal Public Defender
         500 East Main Street, Suite 500
         Norfolk, Virginia 23510
         Telephone:    (757) 457-0800
         Facsimile:    (757) 457-0880
         suzanne_katchmar@fd.org
         sean_mitchell@fd.org